Good morning, Judge Pregerson, Judge Fletcher, Judge Brunetti. My name is Katherine Bloomfield, and I'm arguing on behalf of plaintiff Starla Motley and her son, Juan Jamerson. Before I get started, I was listening rather intently to the first argument, and a couple of issues came up regarding Heck and Gilty, please. And I just cite to this Court the Mass Circuit decision in Ovi v. Gwynn, and there are two U.S. Supreme Court decisions which predate Heck, but the principles therein outlined explain why Gilty, please, excuse me, or Nolo, please, do not portend or preclude a subsequent Fourth Amendment claim. And that's Herring v. Perseus and U.S. v. Tollett. And I think under California law, there's a statute that states that a Nolo plea to a misdemeanor has no collateral estoppel effect in a subsequent civil proceeding. And, Judge Fletcher, you penned a decision in Sloman v. Tadlock, which addressed the joint action issue between a citizen getting the assistance of the police, and the cite for that is 21 F. 3rd, 1462. You can put all those cites on one of our labels that we'll give you. She's just giving us advice on our first case. No, no, Your Honor. I'm not trying to give advice. I just, I know of these cases in my head. I think about them far too often, and they just jumped into my head when I heard the argument. In the case that I'm here to argue, I believe that plaintiffs have put their positions thoroughly in the opening brief and in the reply brief, and not meaning to waste anybody's time should the Court – I have nothing further to add. Skip the saucier and the analysis. Let's assume there was a constitutional violation. When do we determine for qualified immunity what the law was and whether it was uncertain? I believe that that is determined at the time that the police officers took their action, and I believe in this case, under Ninth Circuit law, or starting with whose rights were violated here, and that's the rights of Darla Motley and her son, the Fourth Amendment, and the law under the Fourth Amendment, long had been established prior to May 1999 that you cannot invade a woman's home without a warrant. No, that's not the issue. It's not invading a woman's home without a warrant. If I understand the facts right, the officers had knowledge or information that they were looking for her boyfriend. That's what they claim that they had, but the facts of the case show that – I understand that, but what – If you take that fact, if you put it in that paradigm, the Ninth Circuit law still was established, even assuming that Mr. Jamerson was on parole, even assuming that Mr. Motley – it was clearly established law that the officers, at a minimum, needed a reasonable suspicion that the purported parolee was involved in criminal activity or a parole violation, because there are terms in parole – So let's stop right there, because I know where you're going, and that's what I wanted to note. So what we're doing now is we're testing the procedure and the policy to go in and look for parolees. We're not talking about invasion of the home. We're talking about whether you can at all, without reasonable suspicion, go look for parolees or find them or go into their homes or their places of residence. I don't understand what you mean by we're testing it. Well, because you're saying that without reasonable suspicion they couldn't go to the home, and they're saying we can go knock on the door and see if the parolee is there. Because I understand the briefs. That isn't – And then the question is, what was the law at the time? Unless I've misphrased what the actions were. I don't believe they argued that they could go to the door at any time and knock on the door. You brought up the argument. I read it very clearly, is that unless you find that the parolee has violated some law, you can't go look in somebody's house looking for them. And as a result of that, because even though he was a resident in that home where they thought he was a resident, and the woman that comes to the door didn't say, he doesn't live here, I don't know him. She says, no, he's not here. And as I understand, she never denied that he might have lived there. In fact, she had his child. The record shows that she did deny that he was there. She did deny that he was not living there because she indicated he was in prison. So the record – That should end the case in your case because it's her home, right? Yes, Your Honor. I think that the first approach to this case is parole is not an issue. The government cannot detract from Ms. Motley's rights by claiming they were violating somebody else's rights or trying to violate somebody else's rights or trying not to violate somebody else's rights. The rights involved are still those of Ms. Motley and her son to be secure in her home. Okay. Let's stop there. Let's just stop there a second. As I understand it, there was indications before they went out, they were given information through the superiors, that this was where Motley, where – is it Jameson? Yeah. Jameson used to live, and this was his girlfriend, whatever. And one of the officers, in fact, knew that he was there at one time. And so if you get past that and they go looking for him, let's suppose they had reasonable suspicion that even more than that, he shot somebody and they had him on camera. And she said he's not here and he's on parole. Did they go through the door? I'm to assume that the officers had reasonable suspicion that somebody actually on parole was involved in criminal activity. Oh, yeah. Jameson's caught on a camera. And I'm to assume that the parolee, Mr. Jameson, actually lives at that home. No, I'm not going to do that. I'm just going to say that what they were told, they were told that he was known to be there. I don't know what the exact – what the language was because I don't want to mistake it. But they were told that Jameson could be found there. Well, I think the issue becomes what were they told, when were they told it, and is that information reliable? They didn't have an arrest warrant either. They're going in on a parole. They're on parole and they've got the parole. There's a parole supervisor there. There's the feds there. They're not going in on a warrant because of the shooting. They're going in looking for the parolee. Taking the facts as you've given them to me, which is that the officers had reasonable suspicion that the parolee had been involved in criminal activity, and the officers, I submit, had probable cause that he lived there, then they could go in, yes. Okay. So here, because they're way above that, they're just looking for somebody and they knock on the door and say, is he here? Then that's where the constitutional violation is in their policy in doing that. They didn't have any reasonable suspicion. They didn't even know he was in a crime. In fact, they just know he might have been there, so they were going to check up on him. It was a checkup. Right. But it was not a checkup. They did not know where this individual – this individual was not on parole. And if you're going to assert a qualified immunity defense, which essentially protects officers from making reasonable mistakes – Well, then you're going up the stream. You're saying they couldn't rely – and I read your brief on this, too – they couldn't rely on their superiors. So everybody on the job that went out there to find – to see if he was there had to make another determination individually as to whether he was there before they could go through the door. Well, let's take the facts as they are. None of – all of these officers, none of them had reasonable suspicion of any criminal activity. None of them had any reasonable suspicion that there was a parolee in violation of his parole, you know, a non-criminal violation such as drinking beer with your friends. No one stepped up to the plate and admitted who was in charge of finding out where the purported parolee lived. Everybody pointed the finger at everybody else. The most that was owned up was that some months prior to this morning raid of this woman's home, a list of parolees was prepared with their then-addresses, which list was commenced – it was admitted by Officer Rue starting three months prior to the raid on the home, at least, and even as early as November of 1998. And this action did – or the acts of the officers did not occur until – I believe it was – I may be misstating. It was either February or May of 1999. So a minimum of three months prior. That's not enough. And they all knew this. They went to a morning meeting. This is what they were told. This is what they knew. So, no, none of the officers had reasonable suspicion of anything, either collectively, individually, or their superiors had it. No one had it. This case is the quintessential case why it is neither objectively reasonable for government officers to rely on something that doesn't exist, to claim a mistake or fact, and they say, whoops, you know, they did a sloppy job in preparing for this raid. They were preparing to raid a home of a woman and a child. The law requires more in order for those actions to be reasonable. I would like to cite one case. Let's see where you're the master of the pause. Actually, I'm usually accused of interrupting people a lot, so. No, you answer these questions very nicely. There's a fairly recent decision that came out of the California Supreme Court of People v. Sanders, and it was October 22nd, 2003, excuse me, and cited at 31 Cal 4, 318. It's not dispositive. It's not controlling, although it does discuss many of the issues that have been raised in the party's briefs, and it very, very clearly states that it was, is, and had been California law that if the police officers, that had to do with the raid of a home of a person who lived with a parolee, the officers did not know that either of the persons were on parole and thereafter attempted to justify their search and seizure of evidence because both the non-parolee and the parolee were arrested, and the court said no. But the officers don't know, and they can't use that as an excuse. On a slightly different issue, I think that if we were to assume that you could go into the parolee's home, you still can't do your search in a harassing manner, and isn't that an issue in this case? It is, yes, Your Honor, because... Who points a gun at a 2-month-old baby or a 6-week, 6-month-old baby? Particularly when the person who responded to the door, the mother of the child, indicated that the parolee was not there, indicated that the parolee, in fact, was not on parole and was in prison, and for the officers to knock her out of the way, barge in with guns drawn, and draw a gun down on a 2-month-old baby is unreasonable. And the case that was relied on by the defendants below, I believe it's Robinson, that case involved the pointing of a gun at an actual suspect. I mean, clearly, I don't think any of the defendants contend that either Ms. Motley or her 2-month-old child were suspects in this case. And there very clearly was law not only out of the Ninth Circuit, but the Seventh Circuit and the Third Circuit as well, which under the previous, more dubious standard of shocking the conscience, pointing a gun at somebody who's not a suspect is unreasonable. It shocks the conscience. If it shocks the conscience, ergo, it must also, at a minimum, be unreasonable. And in making an assessment of whether that action was unreasonable, you do look at the totality of the circumstances. And the totality of the circumstances here cry out that drawing a gun down on Ms. Motley and then to point it at her baby was unreasonable. There was sloppy preparation for this. They go to a woman's home in the wee morning of the hours. They're told that the person they're looking for is in prison. A simple phone call to that person's, you know, previous parole officer would have revealed that and, in fact, did reveal it when one of the defendants, I believe it was Sanchez, actually bothered to pick up the phone two days later after this occurred. And I think under those circumstances and the manner in which this occurred, drawing the weapon down on the child in the manner that it was done, particularly by Officer Kading, who had already made his flippant remarks bragging how he'd been into that house many times before, inquiring into the whereabouts of that really nice ping-pong table, it was unreasonable. And it was error to grant summary judgment as a matter of law. All right. If the Court has no more questions, I'd like to reserve the rest of my time. All right. Good morning, Your Honors. Janet Bogigian on behalf of the City Defendants, Parks, Roof and Kading. I have co-defense counsel here as well on behalf of the Attorney General's office and the U.S. Attorney's office. I'd like to use 10 minutes of the time, and they both would like to use 5 minutes and divide it up that way. I find it very interesting that plaintiffs here come before the Court, and the first thing they do is cite to State law. They cite to the Sanders case, which is a 2003 case, which, of course, was not the State of the law at the time of the parole search in 1999. So it has no relevance. But what is significant to me is they understand the importance of State law in this case. A mere 6 months before the parole search in this case, the California Supreme Court looked at the issue of what is the standard for parole searches in People v. Reyes. And they very clearly stated you can do these searches without having an individualized suspicion of criminal activity, parole violation, et cetera. That was the pronouncement of the California Supreme Court 6 months before the search is done. This, of course, is relevant to the question of qualified immunity. What was the State of the law? Was it clearly established in terms of parole searches at the time of the search? Were the officers reasonable in believing that the State of the law was what they were doing was constitutionally permissible? Was it unreasonable for LAPD and the other officers involved in the situation to look at the pronouncement of the California Supreme Court for determination of what were the governing standards on parole searches? Of course, that was eminently reasonable. Okay. Well, let's for the moment accept that as being correct. These officers were kind of trying to clean up Newton Street, I guess. So they weren't particularly after this particular parolee. They go there with clearly stale information as to whether he was there or not. They ring the doorbell. She says, he's not here. He's in jail. So let's take it from there. What is reasonable thereafter? Well, first of all, I guess I would not object to but say that the characterization of stale information isn't completely accurate. We don't really know when the information was gathered. Well, we think probably November. Well, no, no. November of 98, if you read the record carefully, was when, according to Officer Ruge, this career criminals unit was formed. That's when the whole idea of looking into the gang criminal patterns in Newton became an issue. It's very clear that's just when the general idea was formed, not necessarily when the specific packages were compiled. Okay. Well, it's clear that they did not call who had been her parole, his parole officer to find out where he was. That was not done. There's no evidence in the record that that specifically was done. But keep in mind, we have to keep in mind the practicalities of the situation, how many people are on parole, how many people are assigned to a particular parole officer. We have to keep in mind the dictates of the Constitution. Correct. But in terms of understanding the reasonableness of what the officers did in this case. Well, let's say they were reasonable to go to the door. Okay. But they knew they didn't have absolutely current information. Well, they believe they did. Particular Officer Kading, if you will recall in the record, was very familiar with Mr. Jamerson. He had been to the house before. He had made arrests of other gang members there before. He knew Mr. Jamerson's mother, who lived in the house in the front. All right. Now so he did have verifying information that he was at the correct residence at this point and that Mr. Jamerson was on parole. He knew that Jamerson had once lived there. He knew that much. More than once, I believe, was the evidence. She says, when they open the door, he's in jail. Now, what should they do then? Well, I certainly don't think that the police are held to a standard of taking at face value what people tell them. The fact that Mr. Jamerson's girlfriend and the mother of his child say he's not here doesn't hold a whole lot of credibility. I mean, I don't think the officer is doing his job if he accepts that at face value. If that's the standard, every time an officer goes to the door of a parolee and they say he's not here, they have to walk away? It's not that he's not here. She says he's in jail. Isn't that a little different? Well, it's just as easy to say he's not here as he's in jail or he's at the market. I don't think her saying where he was really is the critical issue here. And keep in mind also that all of the officers, by their version of the facts, said they heard a male voice inside. Now, she denies there was a male inside the house at the time, and I think there's some real questions as to whether or not. Well, they never found a male inside. No, but at the time they're at the door and she's saying he's not here, they're hearing a male voice inside. Now, she says there was no male inside. Well, but when they went to the door, didn't they have someone at the back door? I'm sorry? Did the police have someone at the back door? One of the Federal agents initially were at the rear. It doesn't matter. They always go to the back door. The facts are there was no male there. No, I understand that according to her version of facts, there was no male actually in the house at the time. Well, in fact, when they went in, there wasn't one. Oh, they say there was. Oh, yes, very much so, that Mr. Jamerson's brother was there. He came over. Well, that's not the officer's version. That is Ms. Motley's version. But the point I was trying to make is whether or not there actually was a male in the house. The information they had was she's saying he's not here, they're hearing a male voice in the house. She says he's in jail. He's in custody. The officers don't have to take at face value what the parolee's girlfriend and mother of his child say. I mean, that's just not required of the police officers to accept the truth of what this person is saying. They're, being reasonable officers, they're evaluating the circumstances, what they know about Mr. Jamerson, what they know about his ties to this house, what they have heard, which is a male voice, which there may or may not have been a male in the house. Maybe the TV was on. Maybe the radio was on. They hear a male voice, which in their minds creates a reasonable suspicion that she's not telling the truth. So the fact that the person who answers the door denies that the person is there or says they're in jail already or whatever else, I don't think ends the analysis here. You look at the reasonableness of the officers in evaluating. Kennedy. What was the evidence that he was living there, in that house? Besides the fact what was done in pulling together the parole package, Officer Kading had worked in the area for some time. In fact, Officer Ruge as well was very familiar with the gang pattern there. Keep in mind that Mr. Jamerson was a certified member of the Fortray Crips gang. He was very well known to the officers in the Newton Division. Kading testified that he had made previous arrests at that house, at Jamerson's house, of other gang members. He said he had personal knowledge that Jamerson lived there, that he had spoken with Jamerson's mother, Judy, who lived in the front house, who also agreed that he was living there. When did he make those inquiries? I'm sorry? When had he made those inquiries? Just in his past experience in working in the Newton area. I mean, a month earlier, two months, three months? Off the top of my head, I don't know specifically when he said he had that information. I'm not even sure if that's specifically in the record or not. But it's just very clear that he was very familiar with Mr. Jamerson and his ties to this house. He knew the layout of the house. He had been in the house before. The man's mother and brother are living in the front house. The man's girlfriend and baby are in the house. I mean, this is pretty strong evidence. It's a reasonableness standard. Did he have a reasonable suspicion Mr. Jamerson lived at that house? On that information, of course. Can I stop you just a second? Sure. I just checked the record. This was a case of motion for summary judgment, right? Eventually ending up all defendants getting the motion granted. Sure. Based upon qualified immunity. Sure. Okay. We've been talking about a lot of facts. Let's take the fact of the adult male voice. On summary judgment, what fact do we use? We use her version of the fact that no, there was no man in the house. Okay. So there's no male voice. There's no male voice. There's no man in the house from which a male voice is coming. There's nothing in the record about was the TV on? Was the radio on? Was there some other manner in which they may have heard a male voice? Maybe they heard the brother who was in the front house. Maybe they heard his voice. So in terms of what the officers objectively knew, the information known to the officers, there's nothing to refute that they heard a male voice somewhere in the vicinity of the house. The fact that she denies there was a man in the house is not really contradictory to that. There is a reasonable explanation that they could have heard a male voice even though, if we take her version, there was no man sitting there in the house. How about the gun on the child? This seems to be a disputed issue of fact relative to what happened there. It seems as though the officer said that the officer with the gun went to the bedroom and was looking around and was holding the gun in the room. And what facts should we look at relative to some re-judgment with regard to that gun? Preposterous as I think they are, we accept her version of the facts. And what is that? Her version of the facts is he had the gun pointed at the five-week-old baby laying on its back on the bed during most of the search. Lying on its back. Lying on its back during most of the search, although she says at one point, and finally when she says Kading is looking in the closet, I don't think his gun is still turned on the child at that point. Kading says this is standard procedure. I'm checking to see if there's somebody present in the room. I've got my weapon drawn. But let's look at whether there's a constitutional violation even based on her version of the facts. We're talking about a five-week-old baby. It's preposterous to assume, and it's medically impossible, that this child has developed a vision to see the weapon, to know that he's being threatened by a weapon, to feel his liberty has been. . . What law do we look to? This really troubled me. Do we look to the law of what the child perceived or the mother perceived? Well, everything I see is the child's Fourth Amendment rights. The mother has no right to assert the child's Fourth Amendment rights. So we can draw down on the child so long as the child is of an age that doesn't understand that the gun is a dangerous weapon. You can hold the gun, and the mother's going to sit there while the gun is on the child. And we don't look at what the mother thought or how the gun pointed at the baby means, I'm going to shoot your baby if I don't get something? Or how do I analyze that? Maybe if there was some cause of action here about emotional distress, witnessing this incident, something along. . . We're talking about reasonableness in this sense because the other cases with guns, there's someone who is of the age of understanding, hands at the head, fingers on the trigger. That's real easy. Right. But here, why is the mother saying. . . So then what is the significance then of the mother saying the gun's on my baby all the time? Well, the only significance is the only way they can even bring this excessive force allegation, the baby can bring it, is for the mother to say what happened. Obviously, the baby can't say what happened. But if the baby's Fourth Amendment rights. . . Oh, come off that. This is the mother seeing a gun trained on her baby. Judge Trott says in the Crawford case, you cannot conduct a search in a harassing manner. That's where the action is. It's the effect on the mother. I understand that morally. . . Legally, this bothers. . . Legally, people. But I firmly believe, and I see no authority contrary, that legally it is the person that is asserting their Fourth Amendment rights for excessive force. It is the baby that is asserting the Fourth Amendment rights. I see no authority that says the mother can assert them. The moral thing, are we saying that the mother was very happy that the gun was on her child? The mother didn't say that. She was very upset that the gun was on the child. But that's legally insignificant. I think it's only legally insignificant. In the reasonableness of this search, it's legally insignificant? Well, I think we're crossing over two different ideas here. Are we talking about the baby's excessive force claim or the reasonableness of the search? Either. Okay. Again, on the excessive force claim, I think it's the baby's delegation, it's the baby's got to be able to show that it felt threatened, that its liberty was infringed upon, and the baby can't do that. So excessive force, I think, is absolutely gone in this case in terms of it's the baby's claim under the Fourth Amendment. In terms of the nature of the search, taking the evidence in the light most favorable again, all I can really say is I think those facts are just preposterous, but to the extent we've sussed out the fact that they held a gun on this infant, that might be preposterous. What's preposterous? Preposterous to accept that's what really happened. Why would an officer feel threatened by a 5-year-old baby laying on a bed? Well, because we're in summary judgment. That's my point. We're in summary judgment, and we have to accept the facts as proposed by the mother. That's what's been driving me here is how we analyze this. Okay. Accept the facts as proposed by the mother. He had the gun out. I had to. Right. He had the gun out. At some point, the gun is pointed in the direction of the mother. She says it's on him all the time when he's in the room. Well, she does say eventually when he was looking in the closet, it moved away from the baby. She does say that. But let's look at it more generally. Is it unreasonable for these officers who are now in the house looking to see whether or not somebody else is in the house, in particular this known gang member is in the house, to have their weapon drawn when they're clearing through this bedroom looking to see if somebody is there? I think what Motley said was the officer's attention seemed to be drawn to the baby, to the startle. The baby woke up and started crying when Officer Caden went into the room. So I guess his automatic reaction, if we take her version, would be to kind of point the gun in that direction. He's startled by a noise. Now you're going in a different direction. Is there anything in the record where the officer holding the gun says, I walked in the room, I saw movement under the bed, I thought somebody was behind the bed, I was pointing the gun toward the child? Let's go in a different direction. What she says, he pointed the gun at the baby. Now what does he say that detracts from the fact that he's pointing the gun at the baby? Well, he denies that he had it trained on the baby the whole time. Well, there you are. We have somebody judge that. You know, I don't think you're making a sale on this one. I'm trying hard, though. I'm just trying to understand the facts. But I think the facts are that he did what was proper under the circumstances. He had his weapon drawn. According to Motley, he seemed startled by the presence of the baby, which is what caused him to turn toward the baby and train the gun onto the baby. That's not unreasonable either. If he goes in a room where he doesn't realize there's this baby laying there crying. Baby lying there crying. Lying there. I'm sorry. I've got a problem with that. That's not unreasonable. Well, we always like to have you leave this courtroom with some greater knowledge. Thank you, Your Honor. All right. Anything else? No. Let's go to the questions. I will pass the ball. Good morning, Your Honors. May it please the Court. I am Assistant United States Attorney David Pincus, and I represent the Federal Appellees James Black and Larry Webster. Let me ask you first. Did the Department leak the information about Mr. Yankman? Your Honor, I have no knowledge about that. And I don't believe there's any evidence in the record. There's no testimony one way or the other. Somehow it got out. I don't know, Your Honor, if that even happened, because there's no sworn testimony. But I would be happy to address that if you'd give me more time, but I have only five minutes, and my clients are depending on me. Oh, we might give you a little extra time. Thank you, Your Honor. I would just like to make three points. First, the law was not clearly established and is not clearly established to this day until profit is decided whether a parole search must be supported by reasonable suspicion. Two, there was nothing unreliable about the information that was provided to James Black and Larry Webster. So they had to write to us. What about a parole search of someone else's home where there's a – where there may be suspicion that the parole violator or the parolee has been living there? Not the parolee's house. Somebody else's house. I believe the standard is that there's reasonable grounds to believe that the parolee is living in that house. And in this case, obviously there was. First of all, my client – you have to put your – in the position of my clients as they understood it. They were provided with the last known address of this parolee. They had no reason to know that this information was stale. They had an officer along with them who had been in that house before. I know that the cases that I've had, there's always some surveillance that goes on. They'll – the officers will go by. They'll look at the home. They may stake out for a while. They see a car with a license. You know, there's some evidence that this parolee is living there. I don't believe that took place in this case, Your Honor, at least from the record. Well, when they go to the door and the woman says he's in jail, does that change the – No. I'm glad you asked that, Judge Fletcher, because I cited three cases in my brief which said that the person does not have to be present for a parole search. Lassa v. Fitzharris, United States v. Daly, and I believe the Jones case out of the Seventh Circuit. All these cases say you can do a parole search even after you are aware that the person is back in custody. So we have to look at this from the perspective of a reasonable officer. And the question is whether any reasonable officer could have believed it would be legal to enter the premises. Any reasonable officer, not necessarily all or even most. And any reasonable officer reading these cases, Lassa, Daly, Jones, I think even Uli, they all had the situation where someone was arrested and yet they still went in on a parole search, because the fact that the person is arrested does not end the need for a parole search in every case. And I would point out, there is no evidence in the record that this gentleman, Jenea Deberson, was not still on parole. All that we know is that he was back in custody. We have no – there is no evidence that his parole was revoked. Kennedy. But how long does it take to find that out? Is there a computer in one of the vehicles? Your Honor. Put the guy's name in there? It tells you. The computer is – yes, Your Honor, but where? Where is that computer? The computer is with the Department of Corrections. Your Honor, my clients are Federal agents. I'm not going to speak for all the officers here. I'm only going to speak for my officers. They were Federal agents. They did not have access to the records of the Department of Corrections. Now, there were a number of cases cited for the first – a number of statutes cited for the first time dealing with Kletz. I want to emphasize that there have been – there's a number of arguments and evidence put in the record that was never presented with respect to the motion that my clients brought. They were only brought six months later with respect to the other defendants' motions. But could I – I could just finish. The Kletz system is the Department of Justice. It is not a system of the Department of Corrections. And so, yes, you're right. You're right. There could be – they could check the Department of Corrections. But who would be able to do that? The parole officer. Let me ask this question. Let's assume that the LAPD could do a parole search. What right did the Federal agents have to do a parole search under these circumstances? They were along to check out what was going on in the street. They were checking possible Federal firearms violations if the parolee had a firearm. But, Your Honor, that's a very good question. In Crawford, who did the parole search? FBI agents who were checking out a bank robbery. I believe there was another case involving ATF agents, but it escapes me right now. It's one of the ones we cited. The California statute on point, Penal Code 3067, says that any peace officer is allowed to do these parole searches, and there's this advanced waiver of the Fourth Amendment rights on that. Are you saying that even if the police officers are told that the parolee is in custody, that they can go in and search for weapons? Is that what you're – I mean, I'm – because you said even though he's not there, they're entitled to search. I'm saying that a reasonable officer wouldn't necessarily have to believe that there's no right to go in, just simply because the person is back in custody. If you read Lata v. Fitzherald's, if you read United States v. Well, I'm going to the search then. Yeah, I understand your authorities, but you're saying that there's a right to search even though the parolee is not there. Yes. So this – the issue is down to what a parole search is. I think that's what this whole case is about. At the time in 1999. Yes, Your Honor, I agree. And I believe that it's also a question of whether – what would a reasonable officer have a right to rely on. And we know from the Ramirez case, the Silverboe County case, that there's a distinction made in the law between line officers and supervisors. My clients, Federal Agents James Webster and – James Black and Larry Webster were line officers. They were given information. Judge Morrow, in her extensive order, found that there was nothing obviously unreliable about that information. And there is nothing to controvert that in the record. I just would like to make one more point. The record in my summary judgment motion, my client's summary judgment motion, was much more limited than that has been presented in the excerpts of record. And in order to get that evidence in, it seemed to me that the appellants are attempting to raise an issue for the first time in their reply brief. That issue is whether Judge Morrow abused her discretion in denying a motion for reconsideration of the grant of summary judgment to my clients. What happened was my clients were granted summary judgment in February 2001. Judge Morrow gave appellants counsel six months to respond to the motion of Agent Sanchez, which was later joined by the other LAPD defendants. In six months, they thought of some new arguments and put some new things in the record. That should have nothing to do with the motion that was filed with respect to my clients. The opening brief does not raise the issue of the motion for reconsideration. That only comes in in the reply brief, and we believe that that is too late to raise this issue and too late to bring this evidence in. But if you allow that to happen, we ask you to keep in mind the question is whether Judge Morrow abused her discretion with respect to that motion for reconsideration. And we don't believe that there's any evidence in the record. They're going to say that the rude deposition which took place later somehow was new evidence. I don't see anything in the rude deposition that contradicts what my client said. And if there was, this argument hasn't been developed even in the reply brief. So it isn't fair sitting here for me to wonder what possible new evidence there must have been. Let me ask just a kind of a philosophic question. If information in respect to a warrant is too stale, then you can't use that warrant. Here there's no warrant, and the information appears to be quite stale. Isn't this a problem? In the Kilo case, the thermal imaging house case, the warrant information was two years old, and that was too stale. Here the information was at most six weeks old. But you know that CLET system, that Department of Justice database that they're talking about, that is at least 30 days behind. So the question, though, Your Honor, is how would my clients know it was stale? You know, in the Roberts case, I believe it's called, in Silver Bow County, the officers weren't required to read the affidavit, the warrant. They were allowed to accept the representations of the briefing officer, what the warrant said and what its parameters were. My clients should not be in a worse position, because they relied, excuse me, on what the briefing officers told them. They had no way to know that this warrant was, this information was stale. There was nothing obviously underlying that. So where does the buck stop in that argument? Somewhere it's got to stop somewhere. Where does it stop? I think that Robinson tells us it's the supervisor's responsibility. Otherwise, every single person has to check, and then you have group liability. You don't look at the individual anymore. You're just strictly liable for what other mistakes that somebody else might have made, even if you had a reason to rely on it. That's not fair, Your Honor. I mean, my clients went to this briefing. They had, one of them had previous experience. The evidence in the record is that this had never happened before. Even Supervisor Rook said that. There is no evidence of any kind that this ever happened before. If this had happened many times, this was routinely leading to false, you know, entering into people's houses, yes, you're right. There would have to be some accountability. But this is the first time it happened, and my clients are line officers in a briefing given by agencies that have access to the information that they don't necessarily have. CLETS is the Department of Justice database. It's not what they're talking about. Even Rook said, the Rook is the leader, he said that he would have to go to the Department of Corrections and look at, go to their office and look at their terminals. He didn't even have access to it from his own station. So how could my clients assume, are my clients, are you saying that they're supposed to assume, oh, the information must be stale, we better go and check? That means that every single, there were ten parolees that day. There were maybe 15 people participating in this. That means that every single one of these people has to go and independently check every single one of the information to make sure it's accurate. And where do you go? You have to go, to make sure it's really accurate and up to date, you have to go to parole. I don't believe the Constitution requires that, and I don't believe that this Court's precedent in Robinson requires that. So what you're telling us is that Federal agents have no reasonable access to a computer that would tell them whether or not a certain person is in custody. I'm not saying that it would be impossible for them to derive that information if they went to parole and asked someone in parole to do it for them. No, no. You didn't hear my question. It was about, they have no computer available to them. I didn't say that. I said that the CLET system, which is maintained by the Department of Justice, was, that may have been something they had access to. But the Department of Corrections database, which is much more up to date, and that's what you should be looking at. The marshal's office has computers, and what do they do? I don't know, Your Honor. To pick up that information. I don't know, Your Honor. But the question is whether they had some reason to check. Did they have some reason not to rely on this information? Was there some history that this information wasn't reliable? The record tells us no. There is nothing. Judge Morrell found that there was nothing obviously unreliable about this information, and my clients had a right to rely on it. I'd also like to say that some of the eight minutes over his time. Yeah. Okay. You're eight minutes over your time. Could I just make one more point? You're over your time. Okay. My clients did not or are not accused of pointing any gun or of seeing any gun pointed at a baby, and therefore, it would be unfair to hold them responsible for that. This concept of vicarious liability for a constitutional tort is not accepted. Thank you very much. Okay. He doesn't have any time. Well, may it please the Court. You know, you're all out of time. Well, I represent Agent Sanchez. I would hope that we would be able to at least make some observations and correct, I think, some of the misapprehension as to the facts that are here as to the staleness of the information. But you didn't allocate your time before you came in here? I was supposed to have five minutes, Your Honor. The city attorney took a lot of time. And we'll give you two minutes. Thank you, Your Honor. I'm Robert Helfand, Deputy Attorney General, on behalf of Agent Sanchez. The saucier test has to be done individually for each particular defendant. In this particular case, Ms. Motley said that my client did absolutely nothing. He stood there and he was polite. The question as to the reasonableness as to the information, the acting briefing, Lieutenant Roof stated that, explained the patterns of the crime that he was studying, stated what they were going to do, explained that they had this intelligence information that was updated at the parole as to the status. The address was the address of record for the parole agency. No, your client is the one who had the access to the parole records and who was in and who was out. Is that right? Not exactly. He was assigned to this task force minutes before. No. My question was, he's the one who would have had access to a computer. No. And he has access as a parole agent. Yeah. But you have to look at the circumstances that are involved. He's assigned to this minutes before the briefing by his supervisor, and that's Ms. Franco who gave a declaration. She had had experience in these type of operations prior, had never had a mistake as to someone's address and status. The same thing with Mr. Sanchez, who gave a declaration and stated that he had never had a mistake as to status. The man was on parole was what they were told. They were told that it was checked. There was a person from parole who verified that the information had been checked. As a matter of fact, I believe that Lieutenant Roof stated that his underlings had been at parole checking the status of all the individuals. So the information that Agent Sanchez had was that it was done by other officers. There was nothing that would be for him to assume that there was any mistake. And that's where the judge stated that it was reasonable for them to believe that he was on parole at the time. But he had access to the computer, and he knew who his parole officer was. Is that right? No, he did not. He did not know who his parole officer was. There is nothing in the record to indicate that. All he was was to go out there as a member of a team and was told all that information had been done. If we are to say that every time that we're going to go and get any information from law enforcement, everything has to stop and the parole agent has to run back to the office and check the computer, we'd never get anything done. Well, it wouldn't work that way anyway, would it? Well, that's how it would have worked here. Now, they had done other searches earlier, and there was no problem. They don't have telephones. Even if a telephone, why would you stop an operation if there's no indication that the information is not accurate? Question again. Where does the buck stop? In other words, assuming the system has a flaw, it could happen. It's not the system flaw. It just could happen. Where does the legal analysis stop here? Your clients should not be held. The Fed should not be held. So who should we look at, and did Judge Morrow do it right? Well, I believe Judge Morrow did it right because she looked at each individual person because the liability is for Agent Sanchez. Did he do something wrong? And she found that his actions were reasonable. Because I understand her reasoning because you're members of the team and you have superiors, then you look to your superiors, right? Correct. That's your Ramirez decision. And what is the duty of the superior then? Under Ramirez, which was the case that my colleague cited, I think he called it Robinson a few times, it says that the supervisors are responsible for making sure that the information is accurate. And so if she found that it was accurate for the supervisor, then she should stand. So you're saying her rationale with regard to the supervisor's actions was correctly analyzed by her. With the facts that was before her, I believe, even though it's not my client, and if I can maybe. Well, because you're passing the buck. I want to find out. Well. I apologize. That's not the right term. The point is that I'm on the team. It's not my responsibility. So if you're to prevail, then you have to show that what she did relative to the supervisor was correct. Not necessarily, because in this particular case, her analysis was that the information that was provided, that it was reasonable for Lieutenant Rube to rely on the information because there was no evidence as to what caused the mistake, whether it was human error, whether they ran the wrong guy's name, whether there was an error in the computer itself. If the instructions were, you know, we've got a lot of crime in this area. Let's take a run at this place. I think I got a hunch. Could he rely on that? Supervisor says, I think we ought to take a run on this place. I've done that before. Let's take a shot at it. In no particular circumstances without anything else, Your Honor, I would believe no. And I believe that Lieutenant, excuse me, Agent Sanchez had stated that in his deposition. He was relying on information. The other case that we had cited in our brief was Troy v. Gaston, in which there was nothing to state that to the highway patrol officer that the information given by LOCO was inaccurate. Thank you very much. Thank you very much, Your Honor. The matter will stand. Oh, we got some rebuttal. Right. Okay. You're the only one that didn't run over. Pardon me? You're the only one that didn't run over. Yeah. Yeah. That's it all my talking in the papers, Your Honor. There's been a lot of discussion over whether the information was stale, was there reasonable suspicion of where Mr. Jamerson lived. There obviously are disputed facts in the record as to whether or not the information was stale, what they did know. The defendants are so busy pointing the fingers at each other, no one will admit to knowing anything. That, I submit, does not meet defendants' burden of proof on summary judgment to prove the affirmative defense of qualified immunity, giving them permission essentially to violate somebody's Fourth Amendment rights. It is clear, it is undisputed in the record, there clearly was no reasonable suspicion, merely a hunch, a general correlation between parolees being bad and crimes was the only basis for going out to that house to begin with. That is under clearly established law, even no matter which way Crawford goes, under U.S. v. Davis, U.S. v. Johnson, Garcia, Garcia-Dash Cruz, and I don't remember the full site, but all the cases are cited in plaintiff's opening and reply briefs, that as of the date that this occurred, the defendants did require reasonable suspicion of at least criminal activity or parole violation. Also under the 1991 Ninth Circuit case in U.S. v. Harper, reasonable suspicion of where Mr. Jamerson lived would not have been enough. In any event, they needed probable cause because they knew he had a cohabitant. If not before they went out there, which if you accept Kading's version is true, he knew this house so well, he knew where everybody lived, he knew the son lived in the front of the house with the mother, and that Ms. Motley lived in the back house with her son. Probable cause was required, U.S. v. Harper, 1991, and they didn't have it. But I nonetheless submit that the defendants still have not even shown the minimal standard of reasonable suspicion. There was discussion about whether a man was in the house. It's clearly a disputed issue, a fact that the parties have differing versions. And again, the burden was on the defendants. It was their motion for summary judgment, their defense. They did not meet that burden. Regarding the baby's rights, I don't think you have to know your rights are being violated to have a claim, number one. And there was no medical record, expert testimony in the record that this baby was unaware of what was going on. I submit to the court that babies do sense these types of things. And let's not forget, in assessing the reasonableness of this raid on Ms. Motley's home, they threatened to take Ms. Motley's child into custody if they didn't let, if she didn't let them in, and they proceeded to knock her out of the way and barged into her home. There was mention made by counsel representing Black and Lebser that the law was clearly, that the law was not clearly established and that nothing could be done until Crawford's decided or something like that. The law clearly was established, and the cases are aptly cited and discussed in plaintiff's opening brief. There, the issue of whether this was raised for the first time in reply was addressed in plaintiff's reply. That's not true. Federal defendants got summary judgment. Plaintiff opposed it with a Rule 56-F motion. After all the periods of time expired for filing motions for summary judgment, the other defendants pounded the court below, ex parte, after ex parte, after ex parte. She finally allowed them to file late-filed motions for summary judgment. And she denied that for the same reasons that she denied the other defendants' motion for summary judgment. Therefore, the evidence and the arguments were properly before the district court and before this Court, vis-à-vis the federal defendants.  motion for summary judgment. Everyone on the defense side is saying that someone checked, someone checked, someone checked, no one checked. It's defendant's burden if they're claiming that they've had a right to reasonably rely on their supervisor telling them where somebody is. The record evidence is nobody checked. And defendants cannot avail themselves of the cloak of reasonableness by claiming the other guy did it. Sanchez, the parole officer, said the feds were in charge of finding out parole status. That, in addition to the California Penal Code statute cited by plaintiff, totally rebut Webster's claim that he claimed in his declaration that he had no access, period, to parole records. Officer Rude first claimed that Kading was in charge of checking the parole records. Then he later retracted that statement and said he didn't know. And then it came out that some lists of multiple parolees and multiple addresses were prepared months earlier. Mention was made that other parole searches that day went off without a hitch. There's no evidence in the record regarding that. In the cases cited, and I believe it's in the footnote in Plaintiff's opening brief, James, by James v. Sadler, Schuman v. Wright, and I also, an additional case, Jones v. Parks. You see the Jones v. Gates or Jones v. Parks. This idea that you blame it on the supervisor doesn't work when you're all acting as integral participants. Each of these defendants claimed to have been looking into something. The feds claimed they were, had reasonable, vague ideas or hunches about Federal firearms violations. The parole officer said he was, there were general notions of something going wrong. And the Ruge and Kading claimed, oh, excuse me, Sanchez claimed something about bank robberies in beach cities, which is nowhere near Newton Street area. Ruge and Kading claimed something about, oh, just too many shootings in the Newton Street area. The Peeble v. Sanders case, which I cited to the court, amply discussed what California law is, was, and will continue to be. And when I say was, I mean at the time of this raid. You're not allowed to make generalized connections between parolees and crimes to justify acting against a parolee. That doesn't amount to reasonable suspicion under Federal law and under California law. It's not enough for a parole search. So, therefore, California law doesn't even remotely support a defense of qualified immunity, because California law clearly is against the defendant's position. The case of Peeble v. Reyes cited by the City of Los Angeles Defense Council, in that case it was very clear the officer who seized and searched the parolee clearly had reasonable suspicion. He had articulable fact after articulable fact that the parolee was violating his parole, that he had been involved in fraud of his employer. He made telephone contact with the parole officer before acting against Reyes. Therefore, Peeble v. Reyes does not help, but instead hurts the defense case. There was mention that, oh, no one has access to the parole records. There's nothing in the record as to the parole officer was. Well, the burden of proof was on the defendants. This was their motion, their affirmative defense. And, in fact, Sanchez, but two days later, was able to make a simple telephone call. And whether anybody had access to a computer or not, they all had access to a telephone. Well, you don't need to feed on every statement they made, do you, here today? Can I just say one more thing, Your Honor? Or two more things? Yes, your time. Okay. I just note for the Court that Mr. Pincus did get extra time to respond to Judge Fletcher's question about who from his office leaked the information. But it wasn't addressed, even though he was given even more time. And the issue of Hunch and Lata, Hunch is not the law, never was the law. Hunch was mentioned in Lata. It was at most dicta. I would have to say that it is a concern because it was rejected by a majority of this Court by reading the concurring opinions. And subsequent Ninth Circuit opinions, Davis, Conway, Garcia-Cruz, all established that reasonable suspicion at a minimum is required. Thank you, Your Honors. Thank you very much. That order will stand submitted. We'll take a short break.
judges: B. Fletcher, Pregerson, Brunetti